STATE OF NORTH CAROLINA v. ROBERT FRANKLIN BREWINGTON

No. 252A99

(Filed 25 August 2000)

**1. Confessions and Other Incriminating Statements— not custodial**

The trial court did not err by admitting statements by a capital first-degree murder defendant where defendant voluntarily drove himself to the Sheriff's Department in a private automobile after a detective requested an interview; defendant was not confined, handcuffed, restrained, threatened, or subjected to any show of force; he consented to a polygraph examination, returning to a waiting room while the test was prepared and voluntarily going to the examination room; when the examiner told defendant that she did not think he was telling the entire truth, he replied that he had been present when the fire was set and blamed it on one of the victims; and when the examiner returned after speaking with the detectives, defendant stated

before she could speak that his fiancee had set the fire. Under the totality of the circumstances, defendant was not in custody during his interview.

### 2. Confessions and Other Incriminating Statements— statements after request for counsel

The trial court did not err in a prosecution for capital first-degree murder and other crimes by admitting statements made by defendant after he indicated that he wished to talk with counsel where defendant was then subjected to interrogation only after continuing to ask questions about the case, telling detectives that he wished to talk without the presence of counsel, and formally waiving his Miranda rights.

### 3. Search and Seizure— consent to search—voluntary waiver of rights

The trial court did not err in a capital prosecution for first-degree murder by admitting evidence seized during a search of defendant's automobile. Although defendant argued that his consent to the search was given without a knowing and voluntary waiver of his Miranda rights, the trial court had already properly determined that none of defendant's constitutional rights were violated during his arrest and interrogation and that defendant had voluntarily waived his Miranda rights. From the totality of evidence regarding defendant's arrest, waiver of rights, interrogation and statements made, defendant knowingly and voluntarily consented to the search of his vehicle.

### 4. Discovery— polygraph—results not discoverable

The trial court did not err in a capital first-degree murder prosecution by denying defendant's motion to discover polygrams (produced by a polygraph test) under N.C.G.S. § 15A-903(e) where defendant asserted that he wanted to submit the polygrams to his own expert to determine whether the examiner had misrepresented the results to defendant. Polygraphs do not fall within the category of examinations contemplated by the statute; furthermore, the issue of whether the examiner correctly interpreted or commented upon the test results is merely one factor bearing upon the total circumstances

**5. Confessions and Other Incriminating Statements— redacted confession of codefendant—other overwhelming evidence**

There was no prejudicial error in a capital prosecution for first-degree murder, conspiracy, and arson in the admission of the redacted and retyped confession of an accomplice where the confession was carefully redacted by taking out complete sentences and groups of sentences that mentioned, connected, or referenced the existence of defendant; the confession as redacted retained a natural narrative flow and did not contain any contextual clues indicating that it had been altered; and, the alterations were subtle, neither attracted the jury's attention nor invited speculation, and did not directly implicate defendant by language which invited the jury to infer that the unnamed third party referred to in the confession was defendant. Furthermore, any Bruton error which may have occurred was harmless beyond a reasonable doubt due to the overwhelming evidence of defendant's guilt, including defendant's own confession.

**6. Criminal Law— joinder—confession of codefendant**

The trial court did not err by joining the capital trials of two defendants for first-degree murder, arson, and conspiracy where defendant Brewington argued that joinder was improper and severance necessary due to prejudice from the introduction of his codefendant's confession, but, as stated elsewhere in the opinion, the admission of the confession did not prejudice defendant.

**7. Homicide— first-degree murder—short-form indictment**

A short-form murder indictment was constitutionally sufficient.

**8. Sentencing— capital—mitigating circumstances—age of defendant**

The trial court did not err during a capital sentencing proceeding by not submitting the statutory mitigating circumstance of defendant's age at the time of the offense, N.C.G.S. § 15A-2000(f)(7), where defendant argues that he presented substantial evidence that his psychological maturity was that of a child even though his chronological age at the time of the murders was 33, there was evidence that defendant appeared to be fairly well adjusted in society, and he had sufficient intelligence to attend community college and establish a good work history. The North Carolina Supreme Court will not conclude that a trial

court erred by failing to submit this mitigator where evidence of emotional immaturity is counterbalanced by other factors.

**9. Sentencing— capital—nonstatutory mitigating circumstances—relatively minor participation—subsumed by statutory circumstances**

The trial court did not err in a capital sentencing proceeding by not submitting defendant's requested nonstatutory mitigating circumstances concerning the fact that he was not present when the killing was done where the court submitted the statutory mitigating circumstance that defendant was an accomplice or accessory and his participation was relatively minor. The court's instruction regarding that mitigator specifically referred to defendant's indirect participation three times and it fully encompassed and more accurately stated the concepts defendant wanted the jury to consider; moreover, any juror who found it to exist was required to give it mitigating value because it was a statutory circumstance. Finally, although defendant argues that the statutory circumstance was insufficient because jurors could have found defendant's absence from the scene to have mitigating value even if his participation was not minor, the court's instruction on the statutory catchall mitigating circumstance gave the jury the authority and opportunity to consider any and all facts in evidence which any member of the jury found to have mitigating value. N.C.G.S. § 15A-2000(f)(4); N.C.G.S. § 15A-2000(f)(9).

**10. Sentencing— capital—mitigating circumstances—instructions—substantially similar to Pattern Jury Instructions**

A defendant in a capital sentencing proceeding could not show that the trial court's instruction prejudiced him where defendant requested the pattern jury instruction on the mitigating circumstance of no significant history of prior criminal activity, the court gave an instruction which was not precisely identical to the pattern jury instruction but was substantially so, and the jury found the circumstance. N.C.G.S. § 15A-2000(f)(1).

**11. Sentencing— capital—aggravating circumstances—especially heinous, atrocious, or cruel—accomplice not at scene**

The trial court did not err during a capital sentencing proceeding by submitting the especially heinous, atrocious, or cruel aggravating circumstance where defendant was not present when the murders were committed. Even though he was not present,

he was personally involved in planning the details of the murders, took deliberate steps to enable the murders to proceed according to his instructions, and does not dispute that the manner in which the victims were murdered is sufficient to support the circumstance. N.C.G.S. § 15A-2000(e)(9).

**12. Sentencing— capital—proportionality**

A death sentence for a first-degree murder was not imposed under the influence of passion, prejudice, or any other factor, the evidence supported the aggravating circumstances found by the jury, and the sentence was not disproportionate. Defendant was convicted of two counts of murder, the jury found three aggravating circumstances, and the jury found the especially heinous, atrocious, or cruel aggravating circumstance.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Bowen, J., on 28 August 1998 in Superior Court, Harnett County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. On 26 October 1999, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 15 May 2000.

*Michael F. Easley, Attorney General, by John G. Barnwell and Joan M. Cunningham, Assistant Attorneys General, for the State.*

*Ann B. Petersen for defendant-appellant.*

LAKE, Justice.

On 30 June 1997, defendant was indicted for two counts of first-degree murder, two counts of conspiracy to commit first-degree murder, one count of conspiracy to commit first-degree burglary, one count of conspiracy to commit first-degree arson, and one count of first-degree arson. Defendant was tried capitally at the 4 August 1998 Special Criminal Session of Superior Court, Harnett County. During the course of the trial, the charges of conspiracy to commit first-degree burglary and conspiracy to commit first-degree arson were dismissed. The jury subsequently found defendant guilty of first-degree arson, both counts of conspiracy to commit first-degree murder, and both counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Following a capital sentencing proceeding, the jury recommended sentences of

death as to each murder conviction. On 28 August 1998, the trial court sentenced defendant to two separate sentences of death, one for each of the two convictions for first-degree murder. The trial court also sentenced defendant to a sentence of 157 to 198 months' imprisonment for the two conspiracy to commit murder convictions and to a sentence of 64 to 86 months' imprisonment for the arson conviction.

At trial, the State's evidence tended to show that defendant and Vera Sue Lee were engaged to be married. Defendant lived in Dunn, North Carolina, with his grandmother, Frances Brewington, who had adopted him as a child, and also with his eight-year-old nephew, Brian Brewington. On 21 April 1997, defendant took out two life insurance policies from Home Beneficial Life Insurance Company. One policy was on defendant's brother, Patrick Brewington, for $75,000. The other policy was on Patrick's son, Brian, for $58,552. Defendant forged Patrick's signature on both policies and named himself as the beneficiary on both. On 29 May 1997, Lee and defendant made a deposit on a lot and mobile home, but the mortgage company refused to approve their loan.

After defendant took out the life insurance policies on Brian and Patrick, Lee met with her friend, Chris Wilson, and discussed the idea of killing Patrick Brewington to get money for a house. Lee offered to share $10,000 from the insurance proceeds with Wilson if they killed Patrick. A week later, Lee, Wilson, and defendant met to discuss killing Patrick, but Wilson refused to help. Lee, however, continued to talk about killing either Patrick or Brian Brewington during the weeks that followed. During this time, Lee also recruited Henry Michael McKeithan to help with the killing, promising him "$200 or $300 Wednesday and about a $1,000 in three to four months."

On 1 June 1997, Lee and defendant discussed defendant's plan for her to kill Frances and Brian Brewington. Defendant told Lee to make the crime look like a robbery, remove a few items such as the TV, stab Frances and Brian, and set the house on fire. On 11 June 1997, defendant and Lee went to an open-air market and bought a knife to use for the killings. During a telephone conversation that evening, defendant told Lee that he was ready for the plan to be carried out.

Around 4:49 a.m. on 12 June 1997, Lee and McKeithan, who had just driven by the Brewington residence and honked the horn to wake defendant, purchased two one-gallon jugs of distilled water at Winn-

Dixie. They emptied the water from the jugs and refilled them with gasoline from the T-Mart on Cumberland Street. During this time, defendant dressed for work; collected the insurance policies and his best clothes for Frances' and Brian's funerals; and left the Brewington home, leaving the back door unlocked. Defendant drove to Hardee World where he met Lee, and defendant put his clothes in the trunk of Lee's car. Defendant then drove to work while Lee and McKeithan drove to the Brewington residence.

When Lee and McKeithan arrived at the Brewington house, they parked the car in the driveway, put on rubber gloves, and entered the house through the back door, carrying the jugs of gasoline. Lee gave McKeithan the knife from the open-air market and told him to kill Brian while she killed Frances. Unable to stab Brian, McKeithan instead poured gasoline around the bedroom where the victims were sleeping. As McKeithan and Lee stood over them with knives, Frances and Brian Brewington woke up and started screaming. McKeithan stabbed Frances Brewington repeatedly and then ran to the car to get his lighter. While McKeithan was outside, Lee, who had stabbed Brian, lit a dishrag at the heater and ignited the gasoline in the bedroom. Although severely wounded, the Brewingtons continued to scream while Lee and McKeithan ran to the car and drove away. Lee and McKeithan buried the knife and burned their clothing and gloves at McKeithan's house.

At approximately 6:15 a.m. that morning, Harnett County Sheriff's Deputy Jerry Edwards saw smoke rising from the Brewington house. He called the fire department, then went to the house and tried to look into the windows, but the smoke was too thick for him to see inside. After the firefighters extinguished the fire, they notified Deputy Edwards that they had found two bodies in the bedroom. Deputy Edwards secured the scene after viewing the bodies and a jug of gasoline and lighter in the living room. Defendant had been summoned from work before the fire was extinguished. When he arrived at the house, defendant spoke with Deputy Edwards. Defendant told Deputy Edwards that he had left for work around 5:30 a.m., and that when he left, the only appliance running was the air conditioner. Defendant was also interviewed twice that day by Deputy Fire Marshal Jimmy Riddle. During the first interview around 8:05 a.m., defendant told Riddle that the microwave would sometimes "kick out" the circuit breakers and that there were several extension cords in the bedroom. Riddle terminated the interview because defendant seemed "very upset." Around 12:20 that afternoon, Riddle again inter-

viewed defendant, who stated that he had left the house by 5:30 a.m. and that he had run several errands before arriving at work. Defendant also stated that his grandmother had been having problems with the air conditioner lately and that he had not seen the jug of gasoline that had been found in the living room.

The preliminary investigation of the crime scene showed that the fire had been deliberately set with an accelerant which was poured on the floor of the bedroom. This conclusion was based on factors such as the "pour pattern" of the gasoline, the color of the smoke and flames, and the elimination of the electrical system and all appliances as possible sources of the fire. The investigation also revealed the knife wounds to Frances Brewington's body. A knife handle and partial knife blade were also found under her body.

Following the investigation, defendant, McKeithan and Lee were arrested and charged. Pursuant to N.C.G.S. § 15A-926, the State elected to try defendant and McKeithan in a joint trial, and Lee was tried separately.

In his first assignment of error, defendant contends that the trial court erred by denying his motion to suppress statements made to State Bureau of Investigation (SBI) Special Agent Gail Beasley at the Harnett County Sheriff's Department on 12 and 13 June 1997. An evidentiary hearing on defendant's motion to suppress began on 24 July 1998, but was not completed that day. The trial court resumed the evidentiary hearing on this issue on 12 August 1998, after the completion of jury selection. On 13 August 1998, in open court, the trial court denied defendant's motion to suppress. On appeal, defendant argues the statements should have been excluded from evidence because they were made at a time when defendant was subjected to custodial interrogation and was not advised of his *Miranda* rights.

Following the evidentiary hearing, the trial court made extensive and detailed findings of fact with regard to defendant's interviews with members of the Harnett County Fire and Sheriff's Departments, which we summarize: At approximately 8:00 a.m. on 12 June 1997, the morning of the fire and before the cause of the fire was known, Deputy Fire Marshal Jimmy Riddle interviewed defendant. Defendant stated that when he left home around 5:30 a.m., the bedroom window air conditioner had been on and that there had been problems with the microwave "kick[ing] out" the house's circuit breakers. At approximately 12:20 p.m. that afternoon, Riddle again interviewed defendant, this time at the Dunn Fire Department and in the pres-

ence of Sheriff's Detective Greg Taylor. Defendant stated that he had left the house for work after waking at 5:00 a.m. that morning, and repeated that the air conditioner had been on when he left and that the microwave oven would often trip the circuit breakers. Defendant also stated that there had been no gasoline in the house when he left.

The trial court's extensive findings of fact further included the following: At approximately 5:30 p.m. that same day, defendant drove himself to the Harnett County Sheriff's Department at Detective Billy Wade's request. Detective Wade asked defendant to take a polygraph test, and defendant agreed. Agent Beasley conducted the polygraph test. Defendant denied any involvement in the deaths, but Agent Beasley told him that she did not think he was telling the entire truth. Defendant then told her that Brian had started the fire, and that defendant had left the house after Brian told him to leave. Agent Beasley left the examination room to tell Detective Wade and SBI Special Agent John Hawthorne what defendant had said. As Agent Beasley returned to the room, defendant spontaneously told her that his fiancée, Vera Lee, had started the fire. Agent Beasley reported this statement to Detective Wade and Agent Hawthorne, who subsequently entered the room and advised defendant of his *Miranda* rights. This occurred at approximately 8:20 p.m. that evening. After defendant received his *Miranda* warnings, defendant stated that he thought he needed to speak with a lawyer. The officers stopped questioning defendant. However, defendant then asked, "What if I know who did it?" Detective Wade told defendant that the officers could not talk to him unless he initiated the conversation. Defendant then stated that he did want to talk to them. Detective Wade again advised defendant of his *Miranda* rights. Defendant signed a written waiver of his *Miranda* rights at 8:33 p.m. that evening.

Additionally, the trial court found that defendant told Detective Wade and Agent Hawthorne that defendant planned the murders with Lee and McKeithan, that the murders were defendant's idea, and that they planned to kill Brian for the proceeds of a $58,000 life insurance policy that defendant had taken out on Brian. Defendant detailed his role in the murders, giving an account of his movements on the morning of 12 June 1997. The trial court found that defendant was rational, coherent, and logical when he waived his *Miranda* rights, and defendant did not appear to be under the influence of alcohol or any drugs other than a prescription medication for his "nerves," which he had taken earlier in the day. Defendant did not at any time request a

lawyer or request that the interview stop. After the interview, defendant freely and voluntarily consented to the search of his automobile, in which several items of evidence were seized, including the life insurance policies that defendant had taken out on Brian Brewington and on Brian's father, Patrick.

Based on these findings of fact, the trial court concluded that defendant's statements to Deputy Fire Marshal Riddle and Agent Beasley were noncustodial and were made freely and voluntarily; that defendant himself reinitiated conversation with law enforcement officers following his being advised of his *Miranda* rights; and that defendant's subsequent statement to Detective Wade and Agent Hawthorne was made freely, voluntarily, and with full comprehension of his *Miranda* rights. The trial court also concluded that none of defendant's constitutional rights were violated during his interrogation and arrest; that defendant was not induced to make a statement or consent to the search of his vehicle by any promises, inducements, or offers of reward, or by any threat or show of force; and that defendant freely, knowingly, and voluntarily consented to the search of his car. The trial court therefore denied defendant's motion to suppress.

At the outset, we note that the standard of review in evaluating a trial court's ruling on a motion to suppress is as follows:

> The trial court makes the initial determination as to whether an accused has waived his right to counsel. Its findings of fact "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995). "Conclusions of law that are correct in light of the findings are also binding on appeal." *State v. Howell*, 343 N.C. 229, 239, 470 S.E.2d 38, 43 (1996).

*State v. Peterson*, 347 N.C. 253, 255, 491 S.E.2d 223, 224 (1997). Furthermore, this Court has recently reaffirmed that

> a trial court's resolution of a conflict in the evidence will not be disturbed on appeal, *State v. Braxton*, 344 N.C. 702, 709, 477 S.E.2d 172, 176 (1996), and its findings of fact are conclusive if they are supported by the evidence, *State v. Robinson*, 346 N.C. 586, 596, 488 S.E.2d 174, 181 (1997). Once this Court concludes that the trial court's findings of fact are supported by the evidence, then this Court's next task "is to determine whether the

STATE v. BREWINGTON

[352 N.C. 489 (2000)]

trial court's conclusion[s] of law [are] supported by the findings." *State v. Hyde*, 352 N.C. 37, 45, 530 S.E.2d 281, 288 (2000).

*State v. Steen*, 352 N.C. 227, 237, —— S.E.2d ——, —— (2000).

[1] In this assignment of error, defendant first addresses the admission of the two statements made by defendant to Agent Beasley at the Harnett County Sheriff's Department after 6:00 p.m. on 12 June 1997. Defendant argues that these statements should have been excluded from evidence because they were made at a time when defendant was subjected to custodial interrogation and had not been advised of his *Miranda* rights. We disagree.

In determining whether a statement is voluntary, this Court reviews the totality of the surrounding circumstances in which the statement was made. *Hyde*, 352 N.C. at 45, 530 S.E.2d at 288. This Court reaffirmed that pertinent factors include

> whether defendant was in custody, whether he was deceived, whether his *Miranda* rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.

*State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994). Additionally, with regard to the question of whether a person is in custody, this Court has stated:

> The United States Supreme Court has held that in determining whether a suspect was in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 128 L. Ed. 2d 293 (1994) (*per curiam*).

*State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 404-05, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997).

Our review of the record, in its entirety, reflects that after Detective Wade requested an interview with defendant, defendant voluntarily drove himself to the Sheriff's Department in a private automobile. Defendant was not accompanied by a police officer. Once defendant arrived at the Sheriff's Department, he was not con-

fined, handcuffed, restrained in any manner, threatened or subjected to any show of force. Defendant consented when Detective Wade asked him if he would agree to take a polygraph examination. After defendant met Agent Beasley, she told defendant that "this test was voluntary and he could leave at any time." Defendant replied that he "had no problem with taking a polygraph." Defendant agreed to sign, and did sign, a polygraph examination consent form, which reaffirmed that defendant was not in custody and was taking the polygraph examination voluntarily. After Agent Beasley explained the polygraphic process to defendant, defendant returned to the waiting room for about ten to fifteen minutes while Agent Beasley prepared for the test. Once Agent Beasley prepared the polygraph, defendant voluntarily returned to the examination room with her. Defendant was not handcuffed or restrained during his interview with Agent Beasley. He was not threatened, and Agent Beasley did not make any promises to defendant. Defendant was not crying and did not appear to be agitated.

At the conclusion of the polygraph test, when Agent Beasley told defendant that she did not believe he was telling the entire truth, defendant stated that he had been present when the fire started, but blamed the arson on his nephew, Brian. No one else was in the room with defendant and Agent Beasley at this time. Agent Beasley left the room and reported defendant's statement to Detective Wade and Agent Hawthorne, and defendant remained in the examining room alone. Defendant was not handcuffed or under any restraint at this time. Agent Beasley returned to the examining room alone. Upon her return, before she could "get a chance to speak," defendant stated, "I know who set the fire and she is sitting out there. . . . She's here. My fiancée, Vera Lee." Defendant never requested a lawyer during the time he spent with Agent Beasley, and she had no further communication with him.

Based on the foregoing, we conclude that the record contains ample evidence which supports the trial court's findings of fact. We also conclude that the trial court correctly determined that, under the "totality of the circumstances," defendant was not in custody during his entire interview with Agent Beasley. Therefore, the trial court properly admitted defendant's statements to Agent Beasley into evidence at trial.

[2] By this same assignment of error, defendant next challenges the admissibility of the statement he made to Detective Wade and Agent

Hawthorne. Defendant concedes that he was then in custody and that he had properly been informed of his *Miranda* rights at this time. However, defendant contends that the trial court erred in admitting his statement into evidence because after defendant invoked his right to counsel, Detective Wade and Agent Hawthorne did not scrupulously honor defendant's right to end the questioning.

Our review of the record reveals that when Detective Wade and Agent Hawthorne entered the examination room at approximately 8:20 p.m. and read the *Miranda* warnings to defendant, defendant responded that he understood each item. Wade subsequently read the *Miranda* waiver to defendant, who did not sign the waiver form. Defendant stated, "I believe I need to talk to a lawyer." Wade responded, "I believe you do too." Defendant concedes that this response indicates that Detective Wade and Agent Hawthorne understood defendant's invocation of his rights to counsel.

After defendant invoked his right to counsel, Agent Hawthorne asked defendant questions that were not "case-specific." Agent Hawthorne testified during *voir dire* that the purpose of these questions "was to document our activity and who we were talking to" and to complete defendant's "Personal History Arrest Form." Specifically, the information Agent Hawthorne sought to obtain was defendant's date of birth, social security number, address, height and weight. The record reveals that while Agent Hawthorne was in the process of obtaining this information, defendant began questioning Detective Wade and Agent Hawthorne about the crimes, and asked, "What if I know who did it?" During *voir dire*, Detective Wade testified that at this point he responded to defendant as follows:

> I informed him that I could not talk to him since he had not waived his rights. There was nothing that I could say to him and he should say nothing to me. And that if he wanted to talk to me, he had to initiate it. I had to re-advise him of his required Miranda rights and he would need to sign the waiver stating that he did not wish to have an attorney.

This testimony indicates that Detective Wade understood that defendant was trying to initiate communication about the case, and Detective Wade correctly reminded defendant that he had invoked his right to counsel. Detective Wade also reminded defendant that he could not discuss the case with defendant unless and until defendant formally waived his *Miranda* privileges in writing.

STATE v. BREWINGTON

[352 N.C. 489 (2000)]

Agent Hawthorne also testified that as defendant continued to ask case-specific questions,

> we explained to him that he had invoked his right to counsel and we couldn't discuss the case with him, and also explained to him that, you know, it couldn't be a one-way conversation; that he'd invoked the right to counsel and I couldn't discuss the facts of the case with him.

Defendant then indicated to both Detective Wade and Agent Hawthorne that he had changed his mind and wanted to participate in the interview, after which both Detective Wade and Agent Hawthorne took steps to "make sure [defendant], in fact, was changing his mind." Agent Hawthorne testified that it was necessary

> [a]lso to make sure that [defendant] understood that he had revoked his right to counsel, that any decision on his part had to be his decision. And he had—in other words, I had to be convinced that he was changing his mind on his own and wanted to, in fact, make a statement.

Once defendant convinced Agent Hawthorne and Detective Wade that he wanted to speak to them, Agent Hawthorne and Detective Wade informed defendant of his *Miranda* rights a second time. Not until defendant formally waived his *Miranda* rights and signed the waiver form did Agent Hawthorne and Detective Wade question defendant about the arson and murders.

During the period between the first and second *Miranda* warnings, Detective Wade and Agent Hawthorne were the only people present in the room with defendant. Defendant was not handcuffed, and while Agent Hawthorne obtained historical and personal data from defendant, defendant appeared to speak in a rational and understanding manner. Defendant did not appear to be impaired, fatigued, or under the influence of a controlled substance.

In *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378 (1981), the United States Supreme Court held that:

> an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484-85, 68 L. Ed. 2d at 386. Defendant asserts that this rule is premised upon the assumption that the first interrogation was immediately terminated for a substantial period of time. *Michigan v. Mosley,* 423 U.S. 96, 46 L. Ed. 2d 313 (1975). Defendant contends that in the case *sub judice,* the initial reading of the *Miranda* warnings constituted the "first interrogation," and that Agent Hawthorne's questions, which were asked in order to complete defendant's "Personal History Arrest Form," constituted a reinitiation of that custodial interrogation in violation of his Fifth Amendment rights. We disagree.

The Supreme Court has defined the term "interrogation" as follows:

[A]ny words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis,* 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308 (1980). Additionally, this Court has held that "interrogation does not encompass routine informational questions posited to a defendant during the booking process." *State v. Ladd,* 308 N.C. 272, 286, 302 S.E.2d 164, 173 (1983). We therefore conclude, based on the aforementioned evidence contained in the record, that defendant was subjected to custodial interrogation only after he continued to ask Detective Wade and Agent Hawthorne questions about the case, told them that he wanted to talk without the presence of counsel, and formally waived his *Miranda* rights. We further conclude that this evidence supports the trial court's findings of fact in this regard, and that these findings of fact support the trial court's conclusions of law. The trial court did not err in denying defendant's motion to suppress his statements and any evidence obtained as a result of those statements.

[3] Finally, under this assignment of error, defendant addresses the search of his automobile on 12 June 1997. After defendant waived his *Miranda* rights and at the conclusion of defendant's interrogation and statements regarding the murders and arson, defendant agreed to allow law enforcement officers to search his vehicle for evidence pertaining to these crimes. After defendant gave his consent, Detective Taylor and Agent Beasley searched defendant's vehicle and seized a number of items of evidence, including the life insurance policies insuring the lives of Brian and Patrick Brewington that named defendant as beneficiary. On appeal, defendant argues that this evi-

dence should have been excluded because defendant's statement giving consent to the search was made without a voluntary and knowing waiver of his *Miranda* rights. This contention is without merit. We have already concluded that the trial court properly determined that none of defendant's constitutional rights were violated during his arrest and interrogation and that he voluntarily waived his *Miranda* rights. From the totality of the evidence of record regarding defendant's arrest, waiver of *Miranda* rights, interrogation and statements made, we conclude defendant knowingly and voluntarily consented to the search of his vehicle. This assignment of error is overruled.

[4] In his next assignment of error, defendant contends that the trial court erred in denying his motion for discovery and production of the documents relating to the polygraph examination taken on 12 June 1997. Defendant filed a motion for supplemental discovery on 5 November 1997. In that motion, defendant made a specific request that the State provide the printout of defendant's 12 June 1997 polygraph test as well as any consent form or other documents that may have been created in connection with the polygraph testing. A hearing on defendant's motion was held on 15 December 1997. On that day, the trial court allowed defendant's motion, but noted, "[W]e may have to go back and look at that one again later."

On 20 February 1998, defendant filed a further motion to compel discovery of the polygram. At the hearing on that motion, the trial court allowed the prosecutor's request to defer a hearing and ruling on that motion until the State could be represented by John Watters, counsel for the SBI. On 19 March 1998, after hearing argument from Mr. Watters and counsel for the defense, the trial court denied defendant's motion to compel and allowed the State's motion to modify the trial court's order on discovery so as to exclude the polygram from discoverable material. The trial court allowed defendant's motion to seal the polygram, which the SBI transmitted to the Harnett County Clerk of Court.

Defendant contends that the polygram falls within the purview of N.C.G.S. § 15A-903(e), which provides for the discovery of "results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case." N.C.G.S. § 15A-903(e) (1999). Defendant therefore argues that this case should be remanded to the trial court with instructions to provide defendant with the polygram. For the reasons stated below, we conclude that polygrams do not fall within the scope of N.C.G.S. § 15A-903.

In *State v. Grier*, 307 N.C. 628, 300 S.E.2d 351 (1983), this Court reviewed the law in North Carolina and in other jurisdictions as to the admissibility of polygraph results. This Court ultimately determined that "in North Carolina, polygraph evidence is no longer admissible in any trial. This is so even though the parties stipulate to its admissibility." *Id.* at 645, 300 S.E.2d at 361. Defendant contends that *Grier* does not apply because he did not intend to introduce into evidence the polygrams themselves. Rather, defendant asserts that he intended to submit the polygrams to his own expert to determine whether Beasley misrepresented to defendant what the polygraph test revealed. However, as this Court clearly stated in *Grier*, the meaning of a polygram depends entirely upon interpretation. *Id.* at 636, 300 S.E.2d at 355-56. Chief Justice Branch, speaking for the Court, explained:

> Even if the accuracy of the machine as a measuring device and the operative theory of the polygraph is accepted, this is not the end of the inquiry regarding the validity of the polygraphic process. All courts and commentators concede that the most important factor to be considered when evaluating the reliability and utility of the polygraph is the role of the examiner. . . .
>
> . . . The recordings of the machine do not, in and of themselves, indicate whether the examinee has been truthful or deceptive. Rather, the ultimate conclusion is totally dependent upon the examiner's *interpretation* and *analysis* of the physiological changes measured by the polygraph. The entire process, then, is a combination of scientific measurement and human evaluation. Because human judgment in the role of the examiner is intrinsic to the method, human error is, perhaps, equally intrinsic. . . .
>
> . . . .
>
> Recognizing that a litigant could legitimately challenge the proffered results of a test on the basis of the motivation of the subject, the subject's physical and mental condition, the competence and attitude of the examiner, the wording of the relevant questions, and the interpretation of the test results, we are acutely aware of the possibility that the criminal proceeding may degenerate into a trial of the polygraph machine. The introduction and rebuttal of polygraph evidence, if all the possibilities for error in the polygraphic process were deeply explored, could divert the jury's attention from the question of the defendant's

guilt or innocence to a judgment of the validity and limitations of the polygraph.

*Id.* at 636, 643, 300 S.E.2d at 355-56, 359-60 (citations omitted).

In *State v. Payne*, 327 N.C. 194, 394 S.E.2d 158 (1990), *cert. denied*, 498 U.S. 1092, 112 L. Ed. 2d 1062 (1991), this Court reiterated its position regarding the admissibility of polygrams that it adopted in *Grier*. The defendant in *Payne* sought the physiological measurements contained in a polygram "as part of his challenge to the admissibility of the statements he made to law enforcement officers after the polygraph examination, as well as to challenge the credibility of those officers' testimony." *Id.* at 201, 394 S.E.2d at 161-62. However, the defendant in *Payne* waited until four days prior to trial to specially request the polygram. *Id.* at 201, 394 S.E.2d at 162. This Court overruled defendant Payne's assignment of error. *Id.*

Defendant in the case *sub judice* construes this Court's decision in *Payne* to mean that polygram readouts are discoverable so long as defendant makes a timely motion to do so. We do not agree. Defendant's argument that polygrams are discoverable under N.C.G.S. § 15A-903(e) ignores this Court's analysis in *Grier* relating the nature of the polygraph. As stated in the above-quoted passage, a polygraph's results are not merely scientific evaluations, but also the product of human judgment. This Court's refusal to admit the results of a polygraph into evidence is grounded in the fear that, given the subjective nature of the results of a polygraph, a "criminal proceeding may degenerate into . . . a judgment of the validity and limitations of the polygraph." *Grier*, 307 N.C. at 643, 300 S.E.2d at 359-60. This concern is not only a threat during the actual trial, but it is present at all aspects of a criminal proceeding. Accordingly, we conclude that a polygraph does not fall within the category of "physical or mental examinations" contemplated under N.C.G.S. § 15A-903(e).

Further, the determination of whether a defendant's inculpatory statement was voluntary depends upon the totality of the circumstances. *Hyde*, 352 N.C. at ——, 530 S.E.2d at 288. The issue of whether the person administering the polygraph correctly interpreted or commented upon the test results is merely one factor bearing upon the total circumstances surrounding defendant's statement made following the agent's comment that she did not think he was telling the entire truth. The significance of this factor is greatly diminished by the unreliable nature of the polygraph due to the subjective nature of an interpretation of its results. Furthermore, and more fundamen-

STATE v. BREWINGTON

[352 N.C. 489 (2000)]

tally, the question of whether the polygraph results themselves were in fact accurate or not has no real bearing on whether defendant's statement was voluntary. For these reasons, we conclude that the trial court did not err in allowing the State's motion to exclude the polygram or polygraph results from discoverable material. This assignment of error is overruled.

[5] Defendant next assigns error to the trial court's admission of codefendant McKeithan's confession into evidence. Both defendant and McKeithan had made statements to law enforcement officers detailing their involvement in the murders. Each defendant's confession implicated himself, his codefendant in this joint trial as well as Vera Sue Lee, who was tried and convicted in a separate trial. The State redacted the confessions to the extent that each defendant's confession contained no references to the other defendant. Defendant argues that the admission of McKeithan's redacted confession into evidence without a limiting instruction violated defendant's right to confront and cross-examine a witness against him. We do not agree.

"The Confrontation Clause of the Sixth Amendment, extended against the States by the Fourteenth Amendment, guarantees the right of a criminal defendant 'to be confronted with the witnesses against him.' " *Richardson v. Marsh*, 481 U.S. 200, 206, 95 L. Ed. 2d 176, 185 (1987). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 111 L. Ed. 2d 666, 678 (1990). In *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968), the Supreme Court held that a defendant's rights under the Confrontation Clause are violated when his nontestifying codefendant's confession is introduced at their joint trial, and the confession names the defendant as a participant in the crime. The Court's rationale was that a trial court's limiting instruction for the jury not to consider the confession as evidence against defendant was an ineffective protection of defendant's right of cross-examination. *Id.* at 135-36, 20 L. Ed. 2d at 484-85.

The Supreme Court later limited the *Bruton* rule by holding that there is no Confrontation Clause violation by the admission of a non-testifying codefendant's confession along with a limiting instruction where the confession has been redacted to eliminate defendant's name as well as all references to defendant's existence. *Richardson,*

481 U.S. at 211, 95 L. Ed. 2d at 188. In determining not to extend the *Bruton* rule to fully redacted confessions, the Supreme Court in *Richardson* distinguished the confession in *Bruton* as a "powerfully incriminating" confession that " 'expressly implicat[ed]' the defendant as [the] accomplice." *Id.* at 208, 95 L. Ed. 2d at 186 (quoting *Bruton*, 391 U.S. at 124 n.1, 20 L. Ed. 2d at 476 n.1). In contrast, the Court in *Richardson* described the redacted confession as one that "was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." *Id.* Accordingly, the confession in *Richardson* was evidence requiring "linkage" in order for it to become incriminating. *Id.*

The Supreme Court clarified the significance of a fully redacted confession in determining a *Bruton* issue in *Gray v. Maryland*, 523 U.S. 185, 140 L. Ed. 2d 294 (1998). In *Gray*, the Supreme Court ruled that a confession redacted so as to merely replace defendant's name with a blank and the word "delete" falls within the "class of statements to which *Bruton's* protections apply." *Id.* at 197, 140 L. Ed. 2d at 304. Even though the trial court had given the jury a limiting instruction in *Gray*, the Supreme Court focused its analysis on the adequacy of the redaction. The Supreme Court distinguished the confession in *Gray* from the fully redacted confession in *Richardson* because the State of Maryland in *Gray* "ha[d] simply replaced the nonconfessing defendant's name with a kind of symbol, namely the word 'deleted' or a blank space set off by commas." *Id.* at 192, 140 L. Ed. 2d at 300. Therefore, the Supreme Court ruled that the *Gray* confession was inadequate because, unlike the confession in *Richardson*, it "refer[red] directly to the 'existence' of the nonconfessing defendant." *Id.*

The Supreme Court of North Carolina has held that *Bruton* and its progeny would affect criminal trials in this state as follows:

"The result is that in joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) that the confession is inadmissible as to the codefendant . . . , and (2) that the declarant will not take the stand. If the declarant can be cross-examined, a codefendant has been accorded his right to confrontation."

*State v. Tucker,* 331 N.C. 12, 23-24, 414 S.E.2d 548, 554 (1992) (quoting *State v. Fox,* 274 N.C. 277, 291, 163 S.E.2d 492, 502 (1968)). The North Carolina General Assembly codified these principles in N.C.G.S. § 15A-927(c)(1), which provides:

> When a defendant objects to joinder of charges against two or more defendants for trial because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court must require the prosecutor to select one of the following courses:
>
> a. A joint trial at which the statement is not admitted into evidence; or
>
> b. A joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively deleted so that the statement will not prejudice him; or
>
> c. A separate trial of the objecting defendant.

N.C.G.S. § 15A-927(c)(1) (1999). This Court has held that *Bruton* and its progeny apply only when a confession by a nontestifying defendant is " 'inadmissible as to the codefendant.' " *Tucker,* 331 N.C. at 24, 414 S.E.2d at 554 (quoting *Fox,* 274 N.C. at 291, 163 S.E.2d at 502). "A statement is inadmissible as to a codefendant only if it is made outside his presence and incriminates him." *Id.* at 24, 414 S.E.2d at 554-55. In the case *sub judice,* although McKeithan's statement was made outside of defendant's presence, after it was redacted it did not incriminate defendant. We conclude that because McKeithan's confession was fully redacted and did not incriminate defendant, its admission into evidence did not violate defendant's rights under the Confrontation Clause.

At trial, defendant made a general objection to the admission of McKeithan's redacted confession into evidence, and the trial court overruled this objection. Detective Wade read to the jury McKeithan's redacted confession, which stated in essence: Lee asked McKeithan to meet her at the Main Street Grill, where she offered him "$200 or $300 Wednesday and about a $1000 in three to four months by killing this dude named Pat." After about three failed attempts to kill "Pat," Lee suggested they kill his son instead. McKeithan proposed that they kidnap Brian and hold him for ransom, but Lee said that they would get more money if they killed the boy. On the night of the crime, Lee

and McKeithan bought two water jugs from Winn-Dixie, emptied them out, and filled them with gasoline. After a stop at Hardee World, they drove to the Brewington house. On the way there, Lee said that they should make the crime look like a burglary. They entered the back door of the house, carrying the jugs of gasoline and a hunting knife. Lee told McKeithan to kill Brian and leave "Grandma" to her. McKeithan was unable to stab Brian, but poured gasoline around the bedroom and on the end of both beds. Lee brought a knife from the kitchen, and she' and McKeithan switched knives. Lee put her knife to Brian's throat, and Brian and Frances woke up and started screaming. McKeithan stabbed Frances while Lee stabbed Brian. He then ran to the car to get his lighter, but while he was outside, Lee lit a dishrag at the heater, which she threw into the bedroom. Lee and McKeithan then ran to the car and drove away.

Prior to trial, defendant objected to the adequacy of the proposed redaction of McKeithan's confession and requested that it be modified further. Specifically, defendant directed his complaints to the "blackouts on sections of the confessions." Defendant also complained that the reference in McKeithan's confession that " 'they' bought a knife at a flea market" was a direct reference to him and Lee. Finally, defendant objected to the use of the words "Grandma" and "grandmother" in McKeithan's confession because they referred to Frances Brewington. In response to defendant's objections, the State then deleted the entire sentence which contained the reference to anyone buying a knife. The State also retyped the confession to eliminate the "blackouts" and any suggestion that the confession had been altered. Further, after these additional modifications, the appearance of the words "Grandma" and "grandmother" was reduced to five instances where they were contextually appropriate.

At trial, following the conclusion of Detective Wade's testimony with regard to McKeithan's confession, the trial court noted that it was five o'clock and excused the jury until the following morning. After the jury left the courtroom, the trial court asked the attorneys whether there was anything that needed to be discussed. Counsel for McKeithan then objected as follows:

> Your Honor, the defendant McKeithan would object to the redacted statement being what comes into evidence. We insist and believe it's only fair that the entire statement come into evidence, and we would make that motion that the entire statement come in.

Counsel for defendant Brewington then stated, "We have also made that same objection numerous times, Your Honor, and we would renew it at this time." The trial court denied the defense attorneys' objections and motions that the entire statement come in. At no point did counsel for defendant Brewington request a limiting instruction, and he did not further challenge the sufficiency of the modified statement or last redaction, or question the content of McKeithan's statement.

Now, on appeal, defendant contends that the admission of McKeithan's confession into evidence without a limiting instruction violated defendant's right to confront and cross-examine a witness against him as set forth in *Bruton.* However, the concerns that the Supreme Court addressed in *Bruton* and its progeny, as well as the concerns addressed by this Court in *Fox* and its progeny, arise only if a defendant is incriminated by his codefendant's statement. As this Court has long held, "[t]he *sine qua non* for application of *Bruton* is that the party claiming incrimination without confrontation at least be incriminated." *State v. Jones,* 280 N.C. 322, 340, 185 S.E.2d 858, 869 (1972). Accordingly, this Court will not determine whether the introduction of McKeithan's statements violated defendant's rights under the Confrontation Clause unless this Court first concludes that McKeithan's statement implicated defendant.

Defendant contends that allowing the words "Grandma" and "grandmother" to remain in the confession prejudiced him. Defendant asserts that because he was the victim's grandson, any reference to "Grandma" or "grandmother" was a reference to his existence and thereby violated *Bruton.* As a result of the State's redaction, there were no references to defendant by name, and the five remaining references to "Grandma" or "grandmother" in McKeithan's confession are as follows:

> We went to the back screen door and Vera handed me the knife and told me to go kill Brian and leave *Grandma* up to her. I walked through the bathroom, down a little hallway into *Grandmother* and Brian's room.

> She put the knife to his throat. Brian started screaming and crying and then his *grandmother* woke up and said to me, "Who are you?"

> . . . while I was stabbing *Grandma,* Vera was stabbing Brian.

> Vera threw the dishrag in the bedroom and you could hear
> *Grandma* screaming, "Oh, help me. Help me. Oh."

(Emphasis added.) Defendant contends that the case *sub judice* is analogous to *Gray*, and defendant compares the inclusion of the words "Grandma" and "grandmother" in the instant confession to the artless redactions contained in the *Gray* confession. However, we conclude that the instant case is distinguishable from *Gray*. There was no attempt to disguise the redactions in the *Gray* confession because that confession contained blanks and the word "delete" in place of defendant's name. *Gray*, 523 U.S. at 193, 140 L. Ed. 2d at 300. The redactions in the *Gray* confession obviously encouraged the jury to speculate about those omitted references and overemphasized their importance. *Id.* at 193, 140 L. Ed. 2d at 301. The Supreme Court also noted that in *Gray*, the prosecutor blatantly linked defendant to the deleted names by asking a detective whether the defendant was arrested on the basis of information contained in the codefendant's confession. *Id.* at 188, 140 L. Ed. 2d at 298.

In contrast, the confession in the case at bar was carefully redacted by taking out complete sentences and groups of sentences that mentioned, connected, or referenced the existence of defendant. Additionally, McKeithan's confession as redacted retains a natural narrative flow. It does not contain any contextual clues which indicate that the confession was altered in any manner. Unlike the explicit deletions which the Supreme Court disapproved in *Gray*, the alterations in McKeithan's confession are subtle and neither attract the jury's attention nor invite speculation.

Upon careful review of the record and the evidence introduced at trial, including McKeithan's confession, we conclude that defendant in the case *sub judice* was not incriminated by the inclusion of the words "Grandma" and "grandmother" in McKeithan's confession. Unlike the instant case, the cases where this Court has held that the redacted confession violates *Bruton* are those where, notwithstanding the redaction of defendant's name, the defendant is *directly* implicated by language which invites the jury to infer that the unnamed third party referred to in the confession was the defendant.

This Court reviewed this issue in *State v. Littlejohn*, 340 N.C. 750, 459 S.E.2d 629 (1995). In that case, the State introduced a redacted confession made by Littlejohn which implicated his codefendant Dayson. *Id.* at 755, 459 S.E.2d at 632. That statement did not include defendant Dayson's name or any specific reference to him. *Id.*

However, it did refer to the "three remaining," who divided the money. *Id.* at 756, 459 S.E.2d at 632. This Court recognized that the jury could determine through the process of elimination that defendant Dayson had to be one of the "three remaining" mentioned in the confession. *Id.* However, because there was other overwhelming evidence against the defendant, this Court ruled that the admission of the confession was "harmless beyond a reasonable doubt." *Id.*

The references to "Grandma" and "grandmother" in McKeithan's redacted confession, unlike the confession in *Littlejohn*, do not refer to the existence of someone else who was involved in the crime. The reference to one of the victims by familial relationship does not directly or indirectly identify or implicate defendant. Frances Brewington adopted both defendant and his brother, Patrick, as her children. Therefore, she was both their mother and their grandmother. Furthermore, because Brian was Patrick's son, Frances was both Brian's grandmother and his great-grandmother. Therefore, the references in McKeithan's confession to the familial connection when referring to Frances Brewington do not point to defendant. There is one particular instance in McKeithan's confession where Frances is identified as Brian's grandmother: "Brian started screaming and crying and then *his grandmother* woke up and said to me, 'Who are you?' " (Emphasis added.) This statement clearly refers to Frances as Brian's grandmother. The evidence before the jury showed that McKeithan did not know defendant, Frances, or Brian prior to 12 June 1997. Therefore, it is consistent with what the jury knew and understood about McKeithan for the jury to infer that McKeithan merely adopted Vera Lee's designation of the eighty-two-year-old lady in the bed as "Grandma" and assumed her to be Brian's grandmother. All of McKeithan's references to "Grandma" or "grandmother" in his redacted confession can be appropriately understood as referring to Brian's grandmother.

Even if this Court were to conclude that the inclusion of the five references to either "Grandma" or "grandmother" constituted error, we conclude that such error is harmless beyond a reasonable doubt. This Court has held that a *"Bruton* violation does not automatically require reversal of an otherwise valid conviction." *State v. Hayes*, 314 N.C. 460, 469, 334 S.E.2d 741, 747 (1985). In recognizing this rule, this Court reasoned as follows:

On at least three occasions, the United States Supreme Court has applied a harmless error analysis to claimed *Bruton* violations.

*Brown v. United States,* 411 U.S. 223, 36 L. Ed. 2d 208 (1973); *Schneble v. Florida,* 405 U.S. 427, 31 L. Ed. 2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 23 L. Ed. 2d 284 (1969). . . . [I]t is well established that where two or more persons join together to commit a crime, each of them, if actually or constructively present, is guilty of the particular crime and any other crime committed by the other or others in furtherance of or as a natural consequence of the common purpose. . . . The question of which of the defendants actually committed the assaults was irrelevant to the jury verdicts finding each of the defendants guilty of all of the crimes charged. The interlocking confessions combined with the fact that certain items taken from [the victims] were found in the possession of some of the defendants provided overwhelming evidence of each defendant's guilt as to each charge[,] and any *Bruton* error which *may* have occurred was harmless beyond a reasonable doubt.

*Hayes,* 314 N.C. at 469-70, 334 S.E.2d at 747.

In another decision, *State v. Squire,* 292 N.C. 494, 234 S.E.2d 563, *cert. denied,* 434 U.S. 998, 54 L. Ed. 2d 493 (1977), this Court reached the same result as it did in *Hayes.* In *Squire,* this Court concluded that if there was a *Bruton* error in admitting a codefendant's statement which incriminated defendant *Squire,* then that error was harmless beyond a reasonable doubt. *Id.* at 510, 234 S.E.2d at 573. In reaching this conclusion, this Court determined that the evidence of the defendant's guilt, including the defendant's own confession, was so overwhelming as to render any possible *Bruton* violation harmless. *Id.* at 510, 234 S.E.2d at 572-73.

In the case *sub judice,* on the first day of trial and prior to the admission of McKeithan's confession, defendant's own confession was read to the jury. In that confession, defendant admitted his full participation in the planning, initiation, and attempted coverup of the murders of Frances and Brian. Defendant's confession was internally consistent, and our review of the record reveals that defendant's confession was corroborated by other objective evidence introduced at trial. Defendant's confession was consistent with the testimony of Greg Maitland, a neighbor of the Brewingtons, with regard to being "startled awake" when Lee drove by the Brewington house and honked her vehicle's horn in order to wake defendant. Defendant's confession was also corroborated by physical evidence regarding the stab wounds to the victims, the knife blade found in Frances' hip

STATE v. BREWINGTON

[352 N.C. 489 (2000)]

bone, and the knife handle found under her body. During his confession, defendant gave a detailed description of that knife and also took credit for developing the plan of stabbing the victims and setting the house on fire. Deputy Fire Marshal Riddle's testimony at trial corroborated the portion of defendant's confession where he admitted to taking clothes for Frances' and Brian's funerals when he left the house the morning of the murders, before they were committed. Riddle testified that clothes were missing from defendant's closet in the bedroom. Kevin Harrington testified that he sold defendant the insurance policies on Patrick and Brian. Poshia Bell and Reverend J. Brewington corroborated the importance to defendant of those polices in their testimony regarding defendant's act of bringing the policies to church for members to anoint and pray over. Wilson's testimony corroborated defendant's admission that the original plan was to kill defendant's brother, Patrick; recover the insurance proceeds; and purchase the double-wide mobile home he and Lee wanted. Finally, the law enforcement officers found the insurance policies in Lee's vehicle, corroborating defendant's admission that he removed the policies from the house and put them in Lee's car the morning of the murders.

Based on the foregoing, we conclude that McKeithan's redacted confession did not identify, much less incriminate, defendant. Even assuming *arguendo* that McKeithan's confession did incriminate defendant through inference, we conclude that due to the overwhelming evidence of defendant's guilt, particularly in light of defendant's own confession, any *Bruton* error which *may* have occurred was harmless beyond a reasonable doubt. Defendant also alternatively argues that his confession was not reliable because (1) it did not reflect what he actually said; or (2) it did accurately reflect what he said, but he merely told the officers what they wanted to hear. Defendant argues that the jurors were instructed they were required to determine whether defendant made the statements attributed to him and, if he did, whether those statements were truthful and what weight to give them. Defendant made no objection to this instruction. Further, defendant now asserts that the prosecutor was allowed to argue in closing arguments to the jury, without objection, that the details in McKeithan's statement which overlapped those in defendant's statement could have convinced the jury to find defendant's statements truthful. In light of the foregoing, and particularly in view of our consideration of defendant's first and third assignments of error, we conclude that these arguments are without merit. This assignment of error is overruled.

**[6]** In his next assignment of error, defendant contends that the trial court erred in granting the State's motion for joinder of defendants Brewington and McKeithan for trial, and in refusing to grant defendant's motions for severance.

In a written pretrial motion, the State moved for joinder of defendants Brewington and McKeithan for trial. As basis for this motion, the State argued that public policy strongly favored joinder in a case such as this. Defendant and McKeithan were each charged with two counts of first-degree murder, two counts of conspiracy to commit first-degree murder, and the underlying offense of first-degree arson. Although the State was proceeding on a theory of accessory before the fact against defendant, joinder is still permissible pursuant to N.C.G.S. § 15A-926(b). That section provides in part:

(2) Upon written motion of the prosecutor, charges against two or more defendants may be joined for trial:

a. When each of the defendants is charged with accountability for each offense; or

b. When, even if all of the defendants are not charged with accountability for each offense, the several offenses charged:

1. Were part of a common scheme or plan; or

2. Were part of the same act or transaction; or

3. Were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

N.C.G.S. § 15A-926(b)(2) (1999). Defendant and McKeithan were charged with the same offenses, but on different theories. The several offenses for which defendant and McKeithan were charged were clearly part of a common scheme or plan to murder Frances and Brian Brewington and to disguise their murders by burning the Brewington house.

On appeal, defendant argues that joinder was improper and that severance was necessary to ensure that he received a fair trial because the introduction of McKeithan's confession without a limiting instruction prejudiced defendant. Defendant does not present any new arguments from those addressed in the previous assignment of error regarding this issue. Accordingly, for the reasons previously

stated, we conclude that the admission of McKeithan's confession did not prejudice defendant and that joinder of defendant and McKeithan for trial was proper. This assignment of error is overruled.

[7] In his next assignment of error, defendant contends that the short-form murder indictment was constitutionally insufficient to charge him with first-degree murder. This Court has recently reaffirmed that indictments for murder based on the short-form indictment statute, N.C.G.S. § 15-144 (1999), are in compliance with both the North Carolina and the United States Constitutions. *State v. Braxton*, 352 N.C. 158, 174, —— S.E.2d ——, —— (2000). This assignment of error is overruled.

[8] Defendant contends by his next assignment of error that he is entitled to a new sentencing proceeding because the trial court failed to submit the (f)(7) statutory mitigating circumstance, defendant's age at the time of the offense. N.C.G.S. § 15A-2000(f)(7) (1999). Defendant's attorneys submitted to the trial court a written list of six statutory (including the catchall) and forty-four nonstatutory mitigating circumstances for the jury to consider. The (f)(7) statutory circumstance, defendant's age at the time of the offense, was not included on that list. The trial court ruled that all of the listed circumstances, except for a few of the nonstatutory circumstances, would be submitted as to both murders. Defendant now contends that the trial court's consideration of the mitigating circumstances formally requested by defendant's attorneys was insufficient to fulfill the trial court's obligations concerning the submission of statutory mitigating circumstances to the jury. We disagree.

This Court has recently addressed this issue and held that "this Court will not conclude that the trial court erred in failing to submit the age mitigator where evidence of defendant's emotional immaturity is counterbalanced by other factors such as defendant's chronological age, defendant's apparently normal intellectual and physical development, and defendant's lifetime experience." *State v. Steen*, 352 N.C. at 257, —— S.E.2d at ——. The evidence in *Steen* revealed that defendant was twenty-six at the time of the murder, but that defendant suffered a head injury at twenty-one which caused organic brain damage and resulted in a personality change. *Id.* The evidence also showed that defendant's injury caused him to suffer borderline mental retardation and that his memory was impaired. *Id.* However, there was also evidence that defendant was competent to manage simple financial transactions and had a fair ability to understand, retain and

follow instructions. *Id.* Defendant was gainfully employed and was able to perform his job duties proficiently. *Id.* at 258, —— S.E.2d at ——. Because there was evidence which showed that defendant functioned adequately in society, this Court concluded that the evidence of defendant's immaturity was not so substantial as to require the trial court to submit the age mitigator. *Id.* at 258, —— S.E.2d at ——.

In the case *sub judice*, defendant contends that he presented substantial evidence of his limited intellectual and emotional capacity at trial, primarily through the testimony of Dr. Jerry Noble, a clinical psychologist. Dr. Noble testified that defendant's limited mental capacity, which had declined from the level of low-average when defendant was in public school ten years earlier, was the result of dementia, probably the product of his "AIDS infection." Defendant's full scale IQ was 76, a level just above that of mental retardation. Defendant's evidence tended to show that his social adjustment, as well as his ability to understand situations and alternatives and choose between them in an appropriate way, was even more impaired and in the lowest percentile of the adult population. Dr. Noble testified that defendant's reduced intellectual capacity, in combination with his dependent personality disorder, made defendant very susceptible to being persuaded and dominated. Therefore, defendant now argues on appeal that even though his chronological age at the time of the murders was thirty-three years, he presented substantial evidence that his psychological maturity was that of a child.

However, the record at the sentencing proceeding reflects evidence which counterbalances the foregoing evidence of defendant's mental condition. During cross-examination, Dr. Noble conceded that he is not a medical doctor; that he has had no medical training; and that the AIDS-related dementia was his own diagnosis, not that of a treating physician. Further, Dr. Delia Chiuton, the physician who actually treated defendant at Dorothea Dix, observed no symptoms of AIDS-related dementia and did not believe defendant had AIDS-related dementia. Unlike Dr. Noble, Dr. Chiuton is a medical doctor who has had "extensive training and experience in the diagnosis and treatment of AIDS." Additionally, other evidence showed that defendant was never placed in special-education classes, never repeated a grade, graduated from his school, passed the high school competency test, and attended technical college. In the ninth grade, defendant's reading vocabulary was in the top half of students taking the California Achievement Test. Finally, prior to the murders, defendant had no criminal record, and there was no evidence that defendant

ever abused his girlfriend and codefendant, Vera Sue Lee. Defendant was extremely active in his church and participated in gospel singing groups. Even defendant's own expert witness, Dr. Noble, conceded that defendant had a good work history and that he had the intellectual capacity to understand that murder was illegal and wrong.

Therefore, in light of the foregoing evidence that defendant was thirty-three years of age at the time of the murders, appeared to be fairly well adjusted in society, and had sufficient intelligence to attend community college and establish a good work history, we cannot conclude that the evidence of defendant's immaturity was so substantial as to require the trial court to submit the age mitigator. This assignment of error is overruled.

[9] In his next assignment of error, defendant contends that he is entitled to a new sentencing proceeding because the trial court erred in refusing to submit three nonstatutory mitigating circumstances which were supported by the evidence and which a reasonable juror could have found to have some mitigating value. In a written request, defendant asked the trial court to submit six statutory and thirty-seven nonstatutory mitigating circumstances to the jury. Defendant later revised this request and asked the trial court to submit the same six statutory mitigating circumstances and forty-four nonstatutory mitigating circumstances. During the sentencing charge conference, the trial court stated its intention to submit all of the statutory mitigating circumstances defendant requested; the statutory catchall circumstance, N.C.G.S. § 15A-2000(f)(9); and forty of the nonstatutory mitigating circumstances that defendant requested. Defendant then objected to the trial court's decision to exclude the following four nonstatutory mitigating circumstances defendant requested:

35. The defendant, Robbie Brewington, did not stab or burn anyone.

36. The defendant, Robbie Brewington, was not an active participant in the murders.

37. The defendant, Robbie Brewington, was not present when the crime took place.

38. The codefendant, Vera Lee, received life in prison for her participation in the crime.

Defendant concedes that the trial court properly refused to submit number 38 because the jury did not hear evidence regarding Vera

Lee's life sentence. However, defendant contends that the trial court's refusal to submit numbers 35, 36, and 37 prejudiced him because the jury was erroneously precluded from considering them as a basis for a sentence less than death. We disagree.

Generally, the trial court must submit nonstatutory mitigating circumstances that are supported by the evidence and which the jury could deem to have mitigating value when a defendant makes a timely written request for the trial court to do so. *See State v. Skipper*, 337 N.C. 1, 55, 446 S.E.2d 252, 282 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). However, "[a] trial court's error in failing to submit a nonstatutory mitigating circumstance is harmless 'where it is clear that the jury was not prevented from considering any potential mitigating evidence.' " *Id.* at 56, 446 S.E.2d at 283 (quoting *State v. Green*, 336 N.C. 142, 183, 443 S.E.2d 14, 38, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)).

In the case *sub judice*, the trial court did not preclude the jury from considering as evidence in mitigation that defendant was not present when the murders occurred, that he did not physically stab or burn anyone, or that he was not an active participant in the murders or arson. Upon defendant's request, the trial court submitted in regard to each murder the (f)(4) statutory mitigating circumstance, that "defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor." N.C.G.S. § 15A-2000(f)(4). Additionally, the trial court instructed the jury on the (f)(4) mitigator as follows:

> Next, consider whether the murder was actually committed by another person, and the defendant was only an accomplice in the murder and his participation in the murder was relatively minor. The distinguishing feature of an accomplice or accessory is that he is not the person who actually committed the murder.

> You would find this mitigating circumstance if you find that the victim was killed by another person and that the defendant was only an accessory to the killing and that the defendant's conduct constitutes relatively minor participation in the murder. If one or more of you finds by a preponderance of the evidence that the circumstance exists, you would write yes. If none of you find the circumstance exists, you would write no in the space.

The trial court also instructed the jury on the "catchall" mitigating circumstance:

Finally, members of the jury, you may consider any other circumstance or circumstances arising from the evidence which you deem to have mitigating value. If one or more of you so find by a preponderance of the evidence, you should so indicate by having your foreperson write yes in the space provided after this mitigating circumstance on the issues and recommendation form. If none of you find any such circumstance to exist, you would so indicate by having your foreperson write no in that space.

This instruction invited the jurors to consider any and all mitigating circumstances they deemed to exist from the evidence.

A trial court's failure or refusal to submit a defendant's proposed nonstatutory mitigating circumstances separately or independently is not error where requested mitigating circumstances are subsumed in submitted mitigating circumstances. *Skipper*, 337 N.C. at 55-56, 446 S.E.2d at 282-83. In the instant case, the trial court's instruction regarding the (f)(4) mitigator specifically refers to defendant's indirect participation three times: "the murder was actually committed by another person"; "the distinguishing feature of an accomplice or accessory is that he is not the person who actually committed the murder"; and "the victim was killed by another person." This instruction fully encompassed and more accurately stated the concepts that defendant wanted the jury to consider. Also, because this was a statutory mitigating circumstance, any juror who found it to exist was required to give it some mitigating value. We conclude that defendant's proposed nonstatutory mitigating circumstances were subsumed in the (f)(4) mitigating circumstance submitted to the jury by the trial court.

Defendant also argues, however, that the submission of the (f)(4) statutory mitigating circumstance did not satisfy his request for these three nonstatutory mitigating circumstances because the jurors could reasonably have found mitigating value in his absence from the crime scene, even though finding that defendant's participation was not minor. However, this argument overlooks the purpose of the (f)(9) statutory catchall mitigating circumstance. The trial court's instruction on the (f)(9) mitigator gave the jury the authority and full opportunity to consider any and all facts, "any other circumstance," in evidence which any member of the jury found to have mitigating value. The jury could have given the evidence that defendant was not present during the murders mitigating value under this catchall circumstance. *See State v. McLaughlin*, 341 N.C. 426, 448, 462 S.E.2d 1, 12-13 (1995), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996). No

juror was precluded from considering, finding and attaching mitigating value to defendant's absence from the scene of the murders and arson. We therefore conclude the trial court committed no error in refusing to submit these three nonstatutory mitigating circumstances. This assignment of error is overruled.

**[10]** Defendant contends in his next assignment of error that the trial court committed prejudicial error when it failed to peremptorily instruct the jury in accordance with the North Carolina pattern jury instructions on the (f)(1) mitigating circumstance, that defendant had no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1). For the reasons stated below, we conclude this assignment of error is without merit.

At the close of the evidence in the penalty phase, defendant gave the trial court a written list of the mitigating circumstances he wished to be submitted to the jury. Defendant requested the trial court to peremptorily instruct the jury, in accordance with the North Carolina pattern jury instructions, on the (f)(1) statutory mitigating circumstance, that defendant had no significant history of prior criminal activity. During the charge conference, the prosecutor conceded that defendant was entitled to a peremptory instruction on the (f)(1) mitigator. In its charge to the jury, the trial court gave the following instruction:

> "The defendant has no significant history of prior criminal activity before the date of the murder." The defendant has the burden of establishing this mitigating circumstance by a preponderance of the evidence as explained to you. There is no evidence that the defendant has been convicted of any criminal activity. Accordingly, if one or more of you find the facts to be as all the evidence tends to show, then you will answer this mitigating circumstance yes.

At no point did defendant's attorneys object to this instruction during trial. However, defendant now argues that he is entitled to a new sentencing proceeding because the trial court's instruction was not in accordance with the pattern jury instruction, which states:

> The defendant has the burden of establishing this mitigating circumstance by the preponderance of the evidence, as I have explained to you.

> Accordingly, as to this mitigating circumstance, I charge you that if one or more of you find the facts to be as all the evidence

tends to show, you will answer "Yes" as to Mitigating Circumstance Number (*read number*) on the "Issues and Recommendation" form.

N.C.P.I.—Crim. 150.11 (1994).

The jury found the (f)(1) statutory mitigating circumstance to exist as to each murder. Even though the trial court's instructions were not precisely identical to the pattern jury instructions, they were substantially so, and defendant cannot show how the trial court's instruction prejudiced him. This assignment of error is overruled.

[11] In his final assignment of error, defendant contends that the submission of the especially heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9), violated defendant's rights under the North Carolina and United States Constitutions because it impermissibly allowed the jury to find the existence of an aggravating circumstance based solely upon his codefendants' actions. At trial, defendant objected to the submission of the (e)(9) aggravating circumstance. As basis for this objection, defendant argued that he was not present at the time of the homicides and that there was no evidence that he intended the killings to be carried out in a manner that was especially heinous, atrocious, or cruel. The trial court overruled defendant's objection and submitted the (e)(9) aggravating circumstance on the issues and recommendation as to punishment forms with respect to both murders. On appeal, defendant asserts that the (e)(9) aggravator was properly submitted only as to McKeithan. Defendant concedes that the evidence shows that the murders were committed in a manner that was especially heinous, atrocious, or cruel, and that the evidence also shows that McKeithan was personally culpable for the specific details of the killings. However, defendant contends that because there was no evidence showing that he was personally culpable for the specific details of the killings, the trial court committed reversible error in submitting the (e)(9) aggravating factor as to him. We disagree.

Defendant was tried and convicted of two counts of first-degree murder, two counts of conspiracy to commit murder, and one count of arson. Defendant admitted to planning the murders and enlisting his codefendants to perform the murders. Because defendant was not present when the murders were actually committed, defendant was convicted under the theory that he was an "accessory before the fact." Pursuant to N.C.G.S. § 14-5.2, North Carolina law does not rec-

ognize any guilt or sentencing distinctions between an accessory before the fact and a principal to a felony. This statutory section provides in part:

> All distinctions between accessories before the fact and principals to the commission of a felony are abolished. Every person who heretofore would have been guilty as an accessory before the fact to any felony shall be guilty and punishable as a principal to that felony.

N.C.G.S. § 14-5.2 (1999). This Court has held that "accessories before the fact, who do not actually commit the crime, and indeed may not have been present, can be convicted of first-degree murder under a theory of aiding and abetting." *State v. Bond*, 345 N.C. 1, 24, 478 S.E.2d 163, 174-75 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997). "A showing of defendant's presence or lack thereof is no longer required." *Id.*

The United States Supreme Court has held that capital punishment must be tailored to the particular defendant's personal responsibility and moral guilt. *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140 (1982). In construing *Enmund*, this Court stated:

> In *Enmund*, the Court held that the Eighth Amendment forbids the imposition of the death penalty on a defendant who aids and abets in the commission of a felony in the course of which a murder is committed by others, when the defendant does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. *Id.* at 797, 73 L. Ed. 2d at 1151. Thus, an *Enmund* issue only arises when the State proceeds on a felony murder theory.

*State v. Robinson*, 342 N.C. 74, 87, 463 S.E.2d 218, 226 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 793 (1996). Accordingly, the constitutional concerns that the United States Supreme Court addressed in *Enmund* do not apply in a case where a defendant "intend[s] that a killing take place or that lethal force will be employed." *Id.*

Defendant argues that the submission of the (e)(9) aggravating circumstance as to him was erroneous under our recent decision in *State v. McNeil*, 350 N.C. 657, 518 S.E.2d 486 (1999), *cert. denied*, —— U.S. ——, 146 L. Ed. 2d 321 (2000). The defendant in *McNeil* argued that the trial court's instructions to the jury regarding the (e)(9) aggravating circumstance erroneously allowed the jury to consider the behavior of McNeil's accomplice in committing the murder.

However, this Court approved the submission of the (e)(9) aggravator because there was sufficient evidence showing that McNeil's individual acts toward the victim were especially heinous, atrocious, or cruel. *Id.* at 693-95, 518 S.E.2d at 508-09. Defendant therefore argues that the clear implication of *McNeil* is that submission of the (e)(9) aggravator requires evidence sufficient to show that the defendant was personally involved in the infliction of the particular brutality that justifies a conclusion that the murder was especially heinous, atrocious, or cruel.

This Court has held:

"In determining whether the evidence is sufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravator, we must consider the evidence 'in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.' " *State v. Flippen,* 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998) (quoting [*State v. Lloyd,* 321 N.C. 301, 319, 364 S.E.2d 316, 328, *sentence vacated on other grounds,* 488 U.S. 807, 102 L. Ed. 2d 18 (1988)]), *cert. denied,* [526 U.S. 1135, 143 L. Ed. 2d 1015] (1999). "[C]ontradictions and discrepancies are for the jury to resolve; and all evidence admitted that is favorable to the State is to be considered." *Robinson,* 342 N.C. at 86, 463 S.E.2d at 225.

*McNeil,* 350 N.C. at 693, 518 S.E.2d at 508. This Court has also stated that "capital sentencing must focus on the individual defendant, his crimes, personal culpability, and mitigation," *State v. Gibbs,* 335 N.C. 1, 67, 436 S.E.2d 321, 359 (1993), *cert. denied,* 512 U.S. 1246, 129 L. Ed. 2d 881 (1994), and that the particular facts of each case dictate whether the (e)(9) statutory aggravating circumstance was properly submitted, *McNeil,* 350 N.C. at 693-94, 518 S.E.2d at 508. Additionally, evidence regarding the circumstances of the murders is relevant and admissible to support the submission of an aggravating circumstance. The fact that defendant was not present when the murders occurred, and that a codefendant actually committed the murders, is a matter that a jury would properly consider in determining the *weight* to give an aggravating circumstance and in balancing the aggravating and mitigating circumstances. Furthermore, this Court has stated that in determining the sufficiency of the evidence supporting the (e)(9) aggravating circumstance, "the evidence must be considered in the light most favorable to the State and with all reasonable inferences to be drawn from the evidence." *State v. Moseley,*

336 N.C. 710, 722, 445 S.E.2d 906, 913 (1994), *cert. denied,* 513 U.S. 1120, 130 L. Ed. 2d 802 (1995).

Defendant's confession reveals that defendant and Lee initially developed the idea to murder the victims in order to collect the life insurance proceeds. Defendant told Lee and McKeithan to sneak into the unlocked house after he left for work, stab the victims, and then burn the house to disguise the murders. Defendant directed McKeithan and Lee to use gasoline so the house would burn quickly. Because defendant knew that the house would be burned on the morning of the murders, he removed the insurance policies and his Sunday clothes from the house so they would not be destroyed in the fire. Defendant also confessed that he purchased the knife for McKeithan and Lee to use in the murders.

From this evidence, a reasonable juror could infer that defendant intended for McKeithan and Lee to sneak into the house while the victims were asleep and stab one victim and then the other. Defendant was aware that the victims shared a bedroom, and because he provided only one knife for the two murders, the jury could reasonably infer that defendant knew the stabbings would not be simultaneous. A reasonable juror could also infer that because the victims shared a bedroom and because defendant knew that the killers would necessarily be required to move from one victim in the room to the other, the stabbings could not occur at the same time. Under this scenario, it was likely that death would not be instantaneous for one or both victims or that one or both victims would be left without a fatal wound after the initial attack. Any consideration of these planned circumstances, which logic dictates must have occurred, would clearly call to mind that at least one and possibly both victims would be aware of these ongoing assaults upon them, of the pain they were suffering, and of their probable imminent death, and thus would be placed in terror for some moments.

It is clear from the evidence that defendant and his codefendants carefully considered and planned these killings in considerable detail, including how the house would be burned. Defendant told Lee to use gasoline, intending that the house burn quickly to cover the stabbings. Defendant knew Lee and McKeithan would not stay in the house once the fire began. Therefore, if the stab wounds were not immediately fatal, the fire would ultimately cause the victims' deaths. The evidence shows this is, in fact, the way both victims died. Because of the plan so carefully designed and put in motion

by defendant, his eight-year-old nephew and his grandmother, who gave defendant a home, burned to death. In the context of "especially heinous, atrocious, or cruel," it is difficult to imagine a human mind that could desire such an end for *any* two lives, and for mere money.

Under the particular circumstances of this case, we conclude that there was sufficient evidence from which the jury could infer and conclude that defendant intended and directed McKeithan and Lee to perform the murders in exactly the manner they employed. Even though defendant was not present when McKeithan and Lee committed the murders, defendant was personally involved in planning the details of the murders. Defendant also took deliberate steps to enable the murders to proceed according to his instructions. Defendant does not dispute that the manner in which the victims were murdered is sufficient to support the (e)(9) aggravating circumstance. Because defendant directed that each victim experience the deaths which they suffered, we conclude that the trial court did not err in submitting the (e)(9) aggravating circumstance in this case. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises seven additional issues which he concedes have been previously decided contrary to his position by this Court: (1) the North Carolina death penalty statute is unconstitutional; (2) the trial court erred by failing to prohibit the State from death-qualifying the jury; (3) the trial court erred in denying defendant's motion to examine prospective jurors regarding their opinions on parole eligibility; (4) the trial court erred in excluding evidence of codefendant's Lee's life sentence; (5) the trial court erred in instructing the jury that it was the jury's "duty" to recommend a sentence of death if it found the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances, when considered with the mitigating circumstances, were sufficiently substantial to call for the death penalty; (6) the trial court erred in defining mitigating circumstances as set forth in the pattern jury instructions; and (7) the standards set by the Supreme Court of North Carolina for its proportionality review pursuant to N.C.G.S. § 15A-2000(d)(2) are vague and arbitrary.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for possible further judicial review of this case. We have

considered defendant's arguments on these issues and find no com-
pelling reason to depart from our prior holdings. These assignments
of error are overruled.

## PROPORTIONALITY REVIEW

[12] Having concluded that defendant's trial and capital sentencing
proceeding were free from prejudicial error, we must now review the
record and determine: (1) whether the evidence supports the aggra-
vating circumstances found by the jury and upon which the sentenc-
ing court based its sentence of death; (2) whether the sentence was
entered under the influence of passion, prejudice or any other arbi-
trary factor; and (3) whether the sentence is "excessive or dispropor-
tionate to the penalty imposed in similar cases, considering both the
crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We have thor-
oughly reviewed the record, transcript and briefs in this case. We con-
clude that the record fully supports the aggravating circumstances
found by the jury. Further, we find no indication that the sentence of
death in this case was imposed under the influence of passion, preju-
dice or any other arbitrary factor. We therefore turn to our final statu-
tory duty of proportionality review.

In the present case, defendant was found guilty of two counts of
murder under the theories of premeditation and deliberation and
felony murder. Following a capital sentencing proceeding, the jury
found three aggravating circumstances submitted as to the murder of
Brian Brewington: (i) the murder was committed for pecuniary gain,
N.C.G.S. § 15A-2000(e)(6); (ii) the murder was especially heinous,
atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (iii) the murder
was part of a course of conduct, including defendant's commission of
other crimes of violence against another person or persons, N.C.G.S.
§ 15A-2000(e)(11). The jury also found three aggravating circum-
stances submitted as to the murder of Frances Brewington: (i) the
murder was committed while engaged, or an aider or abettor, in the
commission of arson, N.C.G.S. § 15A-2000(e)(5); (ii) the murder was
especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and
(iii) the murder was part of a course of conduct, including defend-
ant's commission of other crimes of violence against another person
or persons, N.C.G.S. § 15A-2000(e)(11).

The trial court submitted and the jury found, as to each murder,
two statutory mitigating circumstances: (i) defendant had no sig-
nificant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1);
and (ii) defendant acted under domination of another person,

N.C.G.S. § 15A-2000(f)(5). The trial court also submitted the statutory "catchall" circumstance, but the jury did not find "[a]ny other circumstance arising from the evidence which the jury deems to have mitigating value." N.C.G.S. § 15A-2000(f)(9). Of the forty nonstatutory mitigating circumstances submitted as to each murder, the jury found five to exist.

One purpose of our proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has found the death penalty disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, defendant was convicted of two counts of first-degree murder. This Court has never found the death sentence disproportionate in a case where the jury has found defendant guilty of murdering more than one victim. *State v. Goode*, 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). In addition, the jury convicted defendant under the theory of premeditation and deliberation. This Court has stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). The jury in this case also found all three of the aggravating circumstances submitted as to each murder conviction. In none of the cases where this Court has found the death penalty disproportionate has the jury found three aggravating cir-

cumstances. *State v. Trull*, 349 N.C. 428, 458, 509 S.E.2d 178, 198 (1998), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 80 (1999). Finally, of the cases in which this Court has found the death penalty disproportionate, the jury found the especially heinous, atrocious, or cruel aggravating circumstance in only two cases. *Stokes*, 319 N.C. 1, 352 S.E.2d 653; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170.

Neither *Stokes* nor *Bondurant* is similar to this case. As we have noted, defendant here was convicted of murder on the basis of premeditation and deliberation as well as under the felony murder rule. The defendant in *Stokes*, however, was convicted solely on the basis of the felony murder rule. In *Bondurant*, the defendant exhibited his remorse, as he "readily spoke with policemen at the hospital, confessing that he fired the shot which killed [the victim]." *Bondurant*, 309 N.C. at 694, 309 S.E.2d at 183. Defendant in the case *sub judice* "did not exhibit the kind of conduct we recognized as ameliorating in *Bondurant*." *Flippen*, 349 N.C. at 278, 506 S.E.2d at 711.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *State v. McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Finally, this Court has noted that similarity of cases is not the last word on the subject of proportionality. *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). Similarity "merely serves as an initial point of inquiry." *Id.* Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 47.

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.