STATE OF NORTH CAROLINA v. ANTHONY DYWONE BURRELL AND RODNEY MATTHEW BURRELL

No. COA03-989

(Filed 6 July 2004)

## 1. Kidnapping— separate offenses—sufficiency of evidence

The trial court correctly denied defendants' motion to dismiss first-degree kidnapping charges where defendants abducted the victim in his car, drove him to a deserted mall where they stole money, traveler's checks, bank cards, and credit cards, and then drove around with a gun at defendant's head trying to obtain more money from ATM machines. Although defendants argued that the kidnapping was an inherent part of the armed robbery, the robbery for which defendant was indicted was complete with the theft of the money, checks, and cards, and the victim's restraint was more than the technical asportation necessary to complete the armed robbery.

STATE v. BURRELL

[165 N.C. App. 134 (2004)]

## 2. Kidnapping— release in unsafe place—sufficiency of evidence

There was sufficient evidence that a first-degree kidnapping defendant did not release his victim in a safe place where the victim was released on the side of an interstate at about 1:30 a.m., the victim was not given money for a telephone call, the area was wooded, and the victim had to walk for about two miles to find an exit ramp and an open business to obtain help.

## 3. Confessions and Incriminating Statements— nontestifying defendant—letters incriminating codefendant—not plain error

Even if the trial court committed *Bruton* error by allowing unredacted letters written by the nontestifying defendants incriminating each other to be read into evidence in a prosecution for armed robbery and kidnapping, the admission of this evidence was not plain error in light of the overwhelming evidence of defendants' guilt of the charged crimes.

## 4. Appeal and Error— plain error—jury poll—not applicable

A defendant did not object to a jury poll and did not preserve the issue for review. Plain error analysis applies only to jury instructions and evidentiary matters.

Appeal by defendants from judgment entered 7 June 2002 by Judge Lindsay R. Davis, Jr., in Guilford County Superior Court. Heard in the Court of Appeals 28 April 2004.

*Attorney General Roy Cooper, by Assistant Attorney General Daniel D. Addison and Assistant Attorney General Jane Ammons Gilchrist, for the State.*

*Osborn & Tyndall, P.L.L.C., by Amos Granger Tyndall, for defendant-appellant Anthony Dywone Burrell.*

*Irving Joyner for defendant-appellant Rodney Matthew Burrell.*

TIMMONS-GOODSON, Judge.

Anthony Dywone Burrell ("Anthony") and Rodney Matthew Burrell ("Rodney") (collectively, "defendants") appeal their convictions for first-degree kidnapping and robbery with a dangerous weapon. For the reasons discussed herein, we conclude that defendants received a trial free of prejudicial error.

STATE v. BURRELL

[165 N.C. App. 134 (2004)]

The State's evidence presented at trial tends to show the following: On the night of 10 April 2001, Hiroharu Okamoto ("Okamoto") flew from New York to Greensboro, North Carolina, for a business meeting. Okamoto rented a vehicle and drove to the Park Lane Hotel, where he registered at approximately 11:30 p.m. The hotel receptionist instructed Okamoto to park his vehicle in the rear parking lot of the hotel.

While Okamoto was parking his vehicle, defendants were walking near the Park Lane Hotel with Rodney's girlfriend, Valri Baker ("Baker"). The three noticed Okamoto parking his vehicle and decided to rob him. Anthony confronted Okamoto with a gun as soon as Okamoto attempted to exit his vehicle, and Anthony demanded that Okamoto move to the passenger seat of the vehicle. When Okamoto resisted, Rodney stuck Okamoto in the face with his fists. Okamoto then moved to the passenger seat of the vehicle while Anthony entered the driver's seat and took Okamoto's cell phone from him. Rodney and Baker got into the back seat of the vehicle. As Anthony drove the vehicle away from the Park Lane Hotel, Rodney held the gun to Okamoto's head and hip and Baker held Okamoto's hands behind his back.

Okamoto was driven to a dark location he thought was a shopping mall. Defendants and Baker began to search Okamoto, and they took from him $600 in cash, $500 in travelers' checks, several credit cards, two bank cards, and an airline card. Okamoto was then driven to an Automated Teller Machine ("ATM") located somewhere between Greensboro and Burlington, North Carolina. Anthony demanded Okamoto disclose the Personal Identification Number ("PIN") for one of his bank cards. Defendants threatened to kill Okamoto if he lied about the PIN. Eventually Okamoto gave defendants his PIN. Anthony then put on one of Okamoto's hats and attempted to withdraw money from the ATM. After several unsuccessful attempts to withdraw money, Anthony pushed the gun at Okamoto and accused Okamoto of giving him the wrong PIN. Okamoto told Anthony he had provided the correct PIN, but that the card may not work at that particular bank. Defendants and Baker then argued amongst themselves for some time, and after several more unsuccessful attempts to withdraw money, Anthony drove the four to a wooded area.

When they reached the wooded area, Okamoto was searched again, and defendants took from him a telephone book containing three or four more bank cards. Anthony approached Okamoto and

"unlocked" the gun. He pushed the gun into Okamoto's abdomen and threatened to kill Okamoto if he lied again about his PIN. Okamoto was then taken to another ATM. After several unsuccessful attempts to withdraw money, Anthony drove the vehicle away from the bank. Both Anthony and Rodney threatened Okamoto with the gun while they searched Burlington for another drive-through ATM. When defendants became lost, Baker urged them to return to High Point, North Carolina, and she called someone in High Point for directions back to Interstates 40 and 85.

At approximately 1:30 a.m. on 11 April 2001, Anthony found Interstate 85. Defendants pushed Okamoto out of the vehicle and onto the side of the interstate. After defendants and Baker drove away in the vehicle, Okamoto unsuccessfully waved at passing vehicles for help. He walked approximately two miles on the interstate to the nearest exit, where he reached a hotel and recounted the night's events to the receptionist. Okamoto then called the police.

Police officers from Burlington and Greensboro responded to Okamoto's call. After he provided an account of the events, the police transported Okamoto to the Greensboro Police Department. Detective Leslie Lejune ("Detective Lejune") showed Okamoto a photographic line-up. Okamoto identified Anthony as the driver of the vehicle but was unable to identify Baker in the line-up.

On 19 April 2001, Anthony and Baker were arrested in Winston-Salem while driving the vehicle. The arresting officer searched the vehicle and found Okamoto's wallet, credit cards, travelers' checks, and address book, as well as several cell phones. A print matching Anthony's palm was also obtained from the window of the vehicle.

After her arrest, Baker initially confessed that she and defendants had robbed and kidnapped Okamoto. However, after talking to Anthony, Baker withdrew her confession. In her second statement, Baker claimed that she and Anthony had obtained the vehicle in a trade for drugs.

On 17 September 2001, Anthony was indicted for first-degree kidnapping, robbery with a dangerous weapon, and possession of a stolen vehicle. The same day, Rodney was indicted for first-degree kidnapping, robbery with a dangerous weapon, assault on a governmental official/employee, and assault inflicting serious injury. Defendants were tried jointly the week of 3 June 2002. On 6 June 2002, the jury found defendants guilty of first-degree kidnapping and

STATE v. BURRELL

[165 N.C. App. 134 (2004)]

robbery with a dangerous weapon. On 7 June 2002, Anthony pled guilty to possession of a stolen vehicle, and Rodney pled no contest to assault on a government official/employee and assault inflicting serious injury. The trial court imposed consecutive sentences on both defendants. Anthony received 120 to 153 months and 108 to 139 months incarceration, while Rodney received sixty to eighty-one months and fifty-four to seventy-four months incarceration. Defendants appeal.

---

Defendants filed separate appellate briefs to this Court. As an initial matter, we note that neither defendant's brief contains arguments supporting each of the original assignments of error. Pursuant to N.C.R. App. P. 28(b)(6) (2004), the omitted assignments of error are deemed abandoned. Therefore, we limit our present review to those assignments of error properly preserved by defendants for appeal.

In their now consolidated appeal, both defendants argue that the trial court erred (I) by denying their motions to dismiss, and (II) by allowing the introduction of letters written by each co-defendant that implicated the other co-defendant. Rodney argues separately that the trial court erred in conducting the juror poll after the announcement of the verdict.

[1] Defendants first assign error to the trial court's denial of their motions to dismiss. Defendants argue that the trial court violated their constitutional rights by failing to dismiss the charges of first-degree kidnapping. According to defendants, the State presented insufficient evidence to establish that Okamoto's kidnapping was not an inherent part of the armed robbery. We disagree.

N.C. Gen. Stat. § 14-39 defines the law of kidnapping in North Carolina as follows:

Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person . . . shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:

. . . .

(2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony; or

(3)  Doing serious bodily harm to or terrorizing the person so confined, restrained or removed[.]

N.C. Gen. Stat. § 14-39(a) (2003). Kidnapping is elevated to the first degree where the person kidnapped was not released in a safe place. N.C. Gen. Stat. § 14-39(b).

N.C. Gen. Stat. § 14-87 defines the law of armed robbery in North Carolina as follows:

> Any person or persons who, having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, whereby the life of a person is endangered or threatened, unlawfully takes or attempts to take personal property from another or from any place of business, residence or banking institution or any other place where there is a person or persons in attendance, at any time, either day or night, or who aids or abets any such person or persons in the commission of such crime, shall be guilty of a Class D felony.

N.C. Gen. Stat. § 14-87(a) (2003).

It is well established that the same course of action or conduct may produce more than one criminal offense. *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978). For example, a defendant may break into a home, intending to commit larceny, and then, after breaking into the home, actually commit the larceny. In such an instance, the defendant may properly be convicted of both the breaking and entering with intent to commit larceny and the larceny itself. *Id.* at 523-24, 243 S.E.2d at 352. Likewise, the Constitution does not forbid conviction for both kidnapping and another felony committed after such kidnapping, provided that the restraint that constitutes the kidnapping is "a separate, complete act, independent of and apart from the other felony." *Id.* at 524, 243 S.E.2d at 252. Thus, where a defendant is charged with armed robbery and kidnapping, our Supreme Court has noted that the restraint, confinement, or removal required to commit kidnapping must be something more than the inherent restraint necessary to commit armed robbery. *State v. Irwin*, 304 N.C. 93, 102, 282 S.E.2d 439, 446 (1981).

In *Irwin*, the Court found that the victim's removal to the back of a drug store to obtain drugs during an armed robbery was an inherent and integral part of the armed robbery. 304 N.C. at 103, 282 S.E.2d at 446. According to the Court, "[t]o permit separate and additional punishment where there has been only a technical asportation, inherent

in the other offense perpetrated, would violate a defendant's consti-
tutional protection against double jeopardy." *Id.* Thus, where there is
mere "technical asportation," the victim of the kidnapping "is not
exposed to greater danger than that inherent in the armed robbery
itself, nor is [the victim] subjected to the kind of danger and abuse the
kidnapping statute was designed to prevent." *Id.*

In the instant case, we conclude that Okamoto's restraint was
more than the mere "technical asportation" necessary to complete
armed robbery. The evidence presented at trial tended to show that
defendants forced their way into Okamoto's vehicle and took control
of the vehicle at gunpoint. After driving Okamoto to a dark location
he believed was a shopping mall, defendants searched Okamoto at
gunpoint and took from him $600 in cash, $500 in travelers' checks,
several credit cards, two bank cards, and an airline card. Defendants
then proceeded to drive Okamoto to Burlington and then back
towards Greensboro in search of an ATM where defendants could use
Okamoto's PIN to withdraw more money.

Defendants contend that because their "last criminal act . . . was
the attempt to access the ATM machine in Burlington[,] . . . defend-
ants' drive to that destination with the victim was an essential and
necessary step in committing the robbery." However, while defend-
ants may now claim that their "ultimate objective" in their "robbery
enterprise" was to obtain Okamoto's PIN and withdraw money from
the ATM, defendants were indicted for the crime of taking "six hun-
dred dollars ($600.00) in U.S. currency, five hundred dollars ($500.00)
in Travelers checks, an ATM card, six (6) credit cards, and a 2001
Mazda 626, from the person and presence of [Okamoto] without his
consent." Thus, the crimes for which defendants were indicted and
convicted were complete when defendants took control of Okamoto's
vehicle at gun point and his property at the shopping mall.
Furthermore, the evidence tends to show that Okamoto was sub-
jected to a greater amount of danger during the two hours than that
amount of danger inherent in the armed robbery itself. Okamoto's
arms were held behind him and a gun was continually pointed at his
head *after* he had been dispossessed of his vehicle and had his cash,
checks, and credit cards taken from him. Therefore, we overrule
defendants' first argument.

[2] Defendants argue in the alternative that the State presented insuf-
ficient evidence to support the charge of first-degree kidnapping in
that the State failed to show the victim was released in an unsafe
place. We disagree.

STATE v. BURRELL

[165 N.C. App. 134 (2004)]

In support of their argument, defendants cite *State v. White,* 127 N.C. App. 565, 492 S.E.2d 48 (1997). In *White,* this Court held that, for the purposes of N.C. Gen. Stat. § 14-39, a rape victim was released in a safe place where the victim was released at a motel near a major shopping center in the middle of the afternoon, was given change to make a phone call after her release, and was able to go directly to the motel office and seek assistance. *Id.* at 573, 492 S.E.2d at 53. However, other than the fact that Okamoto ultimately found assistance at a hotel, the facts of the instant case sharply contrast those of *White.*

In the instant case, defendants gave Okamoto no money to make a phone call after his release, and they did not release him in a major shopping area or in the middle of the afternoon. Instead, defendants pushed Okamoto out of his vehicle and onto the side of an interstate at approximately 1:30 a.m. The area near the interstate was isolated and wooded. Although he attempted to get the attention of passing motorists, Okamoto was forced to walk approximately two miles along the interstate before he reached the hotel. We conclude that these facts "do not indicate a conscious act on the part of [defendants] to assure that [Okamoto] was released in a safe place." *State v. Garner,* 330 N.C. 273, 294, 410 S.E.2d 861, 873 (1991). Instead, when " 'considered in the light most favorable to the State, giving the State every reasonable inference which may be drawn therefrom,' " *State v. Sutcliff,* 322 N.C. 85, 88-89, 366 S.E.2d 476, 478-79 (1988) (citations omitted), these facts provide sufficient evidence to allow a jury to conclude that defendants did not release Okamoto in a safe place. Therefore, we overrule defendants' alternative argument, and, accordingly, we overrule defendants' first assignment of error.

[3] Defendants next assign error to the trial court's decision to allow the introduction of evidence regarding letters written by each defendant and mailed separately to Baker. Defendants argue that it was plain error for the trial court to allow the State to read into evidence any statement that incriminated either co-defendant. We disagree.

As part of her plea agreement with the State, Baker agreed to testify truthfully at defendants' joint trial. In her testimony, Baker recanted her second statement to the Greensboro Police Department and testified instead that she and defendants robbed Okamoto and stole his vehicle on 10 April 2001. During Baker's testimony, the trial court allowed the State to introduce letters that Baker received while she was incarcerated. Anthony claimed in the letters he wrote to

Baker that "[Baker] wouldn't get no time," and that "if anybody got time, prison time, it would be [Anthony] and not [Baker] or [Rodney]" because "[Anthony] was going to write a statement on himself to clear our name." In one letter, Anthony wrote that "[w]hoever that Chinese dude, he can't just point us out like that 'cause it's a lot of people in the world that could be us." Anthony later wrote and instructed Baker to "[t]ell [me] if those detectives have come back to see [you] and what they are talking about."

A copy of a letter from Rodney to Baker was read into evidence. In that letter, Rodney stated:

> I was thinking how could they know I was in the car because I did not get caught doing anything, and I was not in the car when they stopped y'all that night. . . . About our case, I don't know nothing and won't never say ****. You know an eye for an eye. You stay real and I'll stay true. But about my brother making a statement on himself I would never ask my blood to do that, but I will mention it if **** did not go our way and [Anthony] does that. I know why he would. I know he don't want to see us two be locked up.

In another letter, Rodney instructs Baker to "tell [Anthony] to clear our name because I can't deal with this **** ****." The letter goes on to say that "if [Anthony] writes a statement on himself to clear me and your name [] we get out."

Baker testified that she also received a letter from Anthony after he realized that Baker had agreed to testify at his trial. In that letter, Anthony admonishes Baker for agreeing to testify, stating:

> This is real. You are very wrong for something you have done. For one, my little brother [Rodney] is not to be accused of nothing. We were in the street as a team. Me and you. That's all. No one else. So what we do is us. . . . This is a let you know I'm not playing letter. If you take it, I will go to prison. But I'm real. I can do time if I go and you don't hold me down.

In *Bruton v. United States*, 391 U.S. 123, 132 (1968), the United States Supreme Court held that the State may not use out-of-court statements by one defendant against another defendant during a joint trial if the declarant does not testify at the joint trial. In *State v. Fox*, 274 N.C. 277, 291, 163 S.E.2d 492, 502 (1968), our Supreme Court adopted *Bruton* and described the effect it has on criminal trials in North Carolina as follows:

[I]n joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately.

Both defendants argue that it was plain error for the trial court to admit into evidence statements contained in letters written by their co-defendant because these statements implicated the other defendant and were not redacted prior to the letters being read. Under plain error review, defendants are entitled to a new trial only if they establish that the trial court committed a fundamental error, and that the error was so fundamental that absent the error, the jury likely would have reached a different result. *State v. Jones*, 355 N.C. 117, 125, 558 S.E.2d 97, 103 (2002). In the instant case, assuming *arguendo* that the trial court's decision to allow the unredacted statements to be read into evidence was error, we nevertheless conclude that defendants have failed to meet the heavy burden placed upon them by plain error review.

Courts in this state have held that the admission of incriminating statements of a co-defendant may be harmless error where there is other admissible or overwhelming evidence establishing the defendant's guilt. *State v. Brewington*, 352 N.C. 489, 514, 532 S.E.2d 496, 511 (2000); *State v. Roope*, 130 N.C. App. 356, 367, 503 S.E.2d 118, 126, *disc. review denied*, 349 N.C. 374, 525 S.E.2d 189 (1998). Such evidence includes: admissible statements of the defendant as equally incriminating as the co-defendant's statement, *Brewington*, 352 N.C. at 514, 532 S.E.2d at 511; testimony of victims or other participants in the crime that tends to show defendant was involved in crime, *Roope*, 130 N.C. App. at 365, 503 S.E.2d at 125; and physical evidence establishing that the defendant was involved in the crime, *State v. Hayes*, 314 N.C. 460, 470, 334 S.E.2d 741, 747 (1985), *reversed on other grounds*, 323 N.C. 306, 372 S.E.2d 704 (1988).

In the instant case, both Okamoto and Baker testified to specific actions by each defendant in connection with the crime. Surveillance video from the Park Lane Hotel showed defendants and Baker approach Okamoto in the parking lot, enter his vehicle, and drive away. Anthony was arrested in the very vehicle he was accused of taking, and at the time of his arrest, the vehicle contained property the indictment alleged defendants stole as well as a palm print that

matched Anthony's palm print. Furthermore, statements contained in letters written by each defendant were as self-incriminating as the statements contained in their co-defendant's letters. Thus, we conclude there was overwhelming evidence of defendants' guilt in the instant case, and that any error committed by the trial court with regard to the admission of defendants' out-of-court statements was not prejudicial. Therefore, defendants' second joint assignment of error is overruled.

**[4]** Rodney assigns separate error to the trial court's decision to conduct a juror poll after the jury rendered its verdict. However, we note that Rodney failed to object to this alleged error at trial and thus failed to properly preserve this error for appellate review. N.C.R. App. P. 10(b)(1) (2004). Nevertheless, Rodney now contends that he is entitled to plain error review of this alleged error. However, our Supreme Court has held that "plain error analysis applies only to jury instructions and evidentiary matters." *State v. Wiley*, 355 N.C. 592, 615, 565 S.E.2d 22, 39-40 (2002). Thus, we conclude that Rodney has failed to preserve this issue for plain error review as well. Therefore, Rodney's separate assignment of error is overruled.

No error.

Judges McGEE and TYSON concur.